**TEXAS DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION, Appellant,**

v.

**Opal PETTY, By and Through Her Next Friends, and Linda KAUFFMAN and Herbert Clinton Denson, as Next Friends of Opal Petty, Appellees.**

No. 3–90–002–CV.

Court of Appeals of Texas, Austin.

Aug. 28, 1991.

Rehearing Overruled Nov. 27, 1991.

Toni Hunter, Asst. Atty. Gen., Austin, for appellant.

Deborah C. Hiser, and James C. Harrington, Austin, for appellees and cross-appellants.

Before POWERS, ABOUSSIE and KIDD, JJ.

POWERS, Justice.

Opal Petty, through her "next friends" Herbert Clinton Denson and Linda Kauffman, sued the Texas Department of Mental Health and Mental Retardation to recover damages for personal injuries that Ms. Petty allegedly suffered as a result of the negligence of Department employees. Ms. Petty recovered a judgment against the Department in the amount of $250,000. Both the Department and Ms. Petty appeal. We will affirm the trial-court judgment.

## THE CONTROVERSY

In 1934, the State committed Opal Petty, on her father's petition, to the Austin State Hospital. She was then age 16. She remained in the hospital until 1971, when the authorities transferred her to the San Angelo State School, an institution for the mentally retarded. Ms. Petty remained in the State School until 1985 when authorities "furloughed" her to a foster home, then, four months later, to the home of her niece and nephew, Linda Kauffman and Herbert Clinton Denson.

At the time of her commitment to the State Hospital in 1934, physicians diagnosed Ms. Petty as "hebephrenic schizophrenic."[1] During the 37 years that fol-

---

1. According to Ms. Petty's expert witness, Dr. Jefferson Nelson, schizophrenia is a severe mental disorder that affects thinking, perception, and interpersonal functioning. Symptoms include auditory hallucinations, false beliefs that are not alterable even in the face of reasonable evidence to the contrary, and an inability to express emotion and feeling. "Hebephrenic schizophrenia" is a "particularly disorganized form of schizophrenia," and a patient with the

lowed, however, hospital employees gave various appraisals of Ms. Petty's condition, ranging from mentally ill to not mentally ill, and from mildly mentally retarded, to moderately mentally retarded, to not mentally retarded at all.

While Ms. Petty alleged numerous misdeeds and omissions on the part of hospital personnel, she complained basically that she was wrongfully confined because she was neither mentally ill nor mentally deficient and did not receive any meaningful hearings on her continued commitment; and, she complained that the long period of "confinement" without "commonly accepted psychiatric care, treatment, ... therapy," or training deprived her of living skills she had before being institutionalized, as well as skills that she would have developed but for her confinement. Allegedly, the only "therapy" Ms. Petty received during her years at the State Hospital was 35 years of work in the hospital laundry at a salary of $2.00 per week. Ms. Petty also complained of the failure of State Hospital employees to help her obtain work outside the hospital or otherwise attempt to "restore her to a useful life in society."

The authorities transferred Ms. Petty from the State Hospital to the State School in San Angelo in 1971, following a diagnosis of mental retardation that Ms. Petty alleged was erroneous. Ms. Petty made substantially the same factual allegations regarding her 14–year residence from 1971 until 1985 in the San Angelo State School as she did about her period in the State Hospital, i.e., that her involuntary confinement was unlawful, and that "unreasonable restraint" and "lack of treatment" prevented her from realizing her developmental potential.

Ms. Petty pleaded, and the jury found, that Ms. Petty suffered injury as a result of the negligence of agency personnel "consider[ing] only their use or misuse of ... treatment/habilitation plans, mental status exams, tests, evaluations, diagnoses, interdisciplinary team staffing reports, [and] progress notes."

The trial judge limited Ms. Petty's recovery to injuries resulting from negligence occurring after January 1, 1970, the effective date of the Texas Tort Claims Act, Tex.Civ.Prac. & Rem.Code Ann. § 101.001–.109 (1986 & Supp.1991) ("the Act"); see § 101.061 of the Act.

The jury found Ms. Petty's damages to be $505,000, and the trial court reduced the damage award to $250,000 in accordance with the limit established in § 101.023(a) of the Act.

## GOVERNMENTAL IMMUNITY

 Because the Department is an entity of the State, within the doctrine of governmental immunity, Ms. Petty was obliged to establish legislative consent to suit, see Missouri Pacific R. Co. v. Brownsville Nav. Dist., 453 S.W.2d 812, 813 (Tex.1970), Hosner v. De Young, 1 Tex. 764, 769 (1847), and a legislative waiver of immunity from liability. Missouri Pacific, 453 S.W.2d at 813.[2]

The legislature has expressly consented to suit in § 101.025(b) of the Act ("A person having a claim under this chapter may sue a governmental unit for damages allowed by this chapter."). The legislature has expressly waived immunity from liability, in § 101.025(a), "to the extent of liability created by" the Act. The waiver extends to the following injuries described in § 101.021:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

(A) the property damage, personal injury, or death arises from the opera-

disease may not be able to communicate with others at all, as her speech may be incoherent and her thoughts may leap from one thing to another in no organized fashion.

2. An important corollary of immunity from liability is that the state is generally not liable for the torts of its employees. See Lowe v. Texas

Tech University, 540 S.W.2d 297, 298 (Tex.1976); Dillard v. Austin Indep. School Dist., 806 S.W.2d 589, 592 (Tex.App.1991, writ requested). For a general discussion of sovereign immunity, see Greenhill and Murto, Governmental Immunity, 49 Texas L.Rev. 462 (1971).

tion or use of a motor-driven vehicle or motor-driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law; and

(2) *personal injury and death so caused by a condition or use of tangible personal or real property if the government unit would, were it a private person, be liable to the claimant according to Texas law.*

(Emphasis added).

In order to place her claim within the statute, Ms. Petty was obliged to prove, by a preponderance of the evidence, the elements of common-law negligence plus an additional element—that the negligence alleged involved "a condition or use of tangible personal ... property." *See* § 101.021 of the Act; *Salcedo v. El Paso Hosp. Dist.,* 659 S.W.2d 30, 33 (Tex.1983).

In the present case, the trial court submitted Question 2 to the jury as follows:

From 1970 through 1985, was the negligence, if any, of any agency personnel a proximate cause of any injury to Opal Petty?

For the purposes of question 2 only, in determining negligence, if any, of agency personnel, consider only their use or misuse of medical records, staff meeting results, interdisciplinary team staffing reports, progress notes, individualized treatment/habilitation plans, mental status exams, tests, evaluations and diagnoses.

The jury answered "yes" with respect to the use by agency personnel of individualized treatment/habilitation plans, mental-status exams, tests, evaluations, diagnoses, interdisciplinary team-staffing reports, and progress notes. They answered "no" regarding any use of medical records and staff-meeting results.

 In its first point of error (subpoint A), the Department contends the trial court erred in submitting question 2 to the jury

and in failing to disregard the jury's answer to that question and to Question 14, a related question about damages, because, the Department contends, the individualized treatment/habilitation plans, mental-status exams, tests, evaluations, diagnoses, interdisciplinary team-staffing reports, and progress notes are not "tangible personal property" within the meaning of § 101.-021(2) of the Act. The Department does not complain of the jury's finding that Ms. Petty sustained an "injury."

The Department relies on *Robinson v. City of San Antonio,* 727 S.W.2d 40 (Tex. App.1987, writ ref'd n.r.e.). In *Robinson,* the plaintiff alleged that a police officer's failure to arrest Mr. Robinson, after Mrs. Robinson called and requested help during a domestic crisis, constituted misuse of a protective order that a district court had issued. The San Antonio Court of Appeals held that the protective order was not tangible property within the meaning of the Act; it was, rather, a written memorial of a decision and pronouncement of a district court, and the fact that it had been reduced to a tangible writing did not make it tangible property within the meaning of § 101.021(2). *Id.* at 43.

By analogy to *Robinson,* the Department argues that the various items listed in Question 2 are not "tangible personal property," but simply written memorials by employees of their intellectual observations and decisions concerning Ms. Petty:

(1) The "individualized treatment/habilitation plans" merely record decisions, taken in Ms. Petty's case by the interdisciplinary team, concerning the kind of treatment she should receive.

(2) The "mental status exams" administered to Ms. Petty were simply interviews by psychiatrists that may or may not have been reduced to writing.

(3) The standardized tests [3] administered to Ms. Petty at the state school and the test results were merely aids employed in

---

**3.** These included the Slossin, WAIS, and Stanford–Binet tests, all verbally administered "I.Q." tests, and the Wide Range Achievement Text, a written examination designed to measure levels of achievement in reading, spelling, and mathe-

matics. We do not understand the *Robinson* analogy insofar as these tests are concerned, and the Department offers no further explanation except as stated above.

reaching decisions regarding her treatment.

(4) The "evaluations" and "diagnoses" simply express the subjective judgments reached and decisions taken by physicians in Ms. Petty's case.

(5) The "interdisciplinary team staffing reports" reflect only the subjective judgments of mental-health professionals regarding Ms. Petty's treatment.

(6) The "progress notes" merely record the staff employees' subjective observations of Ms. Petty.

The Act does not define "tangible property." We are bound, however, by the supreme court's rationale and interpretation of the phrase in *Salcedo*, 659 S.W.2d at 33.[4] In *Salcedo*, the plaintiff's husband died of a heart attack after his treating physician had released him from a public hospital. The plaintiff alleged that the physician and staff of the hospital "misused the equipment and tangible property ... by improperly reading and interpreting the electrocardiogram graphs and charts produced by such equipment." The supreme court held that the plaintiff's pleadings alleged an injury caused by "the negligence of the hospital district's employees in the use of tangible property" and therefore stated a cause of action under the Act. *Salcedo*, 659 S.W.2d at 32–33.

The Department attempts to distinguish the electrocardiogram chart in *Salcedo* from the notes, reports, evaluations, and diagnoses in the present case. The Department argues that an electrocardiogram mechanically records tangible body signals, i.e. the actions of the heart, while the papers in Ms. Petty's case are mere "memorialization of human judgment and decisionmaking." We cannot see any material distinction between a physician's interpretation of the paper reflecting the impulses of the heart in *Salcedo* and the employees' interpretation of the papers reflecting Ms. Petty's responses to questions and the staff's observations of her physical and emotional behavior. The physician acted or failed to act on the basis of one paper in *Salcedo;* the evidence shows that the employees in Ms. Petty's case acted and failed to act on the basis of the various documents mentioned above. We therefore hold, pursuant to *Salcedo*, that the individualized treatment/habilitation plans, mental status exams, evaluations, diagnoses, interdisciplinary team staffing reports, and progress notes constitute tangible property within the meaning of § 101.021(2) of the Act.

With respect to the standardized tests (the three verbally administered I.Q. tests and the written achievement test), we distinguish the "blank" tests from those which were in fact administered to Ms. Petty.[5] We hold the latter are tangible property within the meaning of *Salcedo:* the tests taken by Ms. Petty recorded her answers to oral and written questions and the test administrators' observations of Ms. Petty's behavioral responses to oral instructions. We cannot distinguish these tests from the electrocardiograph in *Salcedo*. With respect to the "blank" tests, we need not decide whether they constitute

---

4. We are aware that the cryptic language of § 101.021 has resulted in conflicting opinions in the courts of appeal regarding what constitutes tangible property within the meaning of § 101.021. *See, e.g., City of Houston v. Arney,* 680 S.W.2d 867, 874 (Tex.App.1984, no writ) (Plaintiff who had hysterectomy because clinic personnel failed to inform her that pap smear results were positive stated a cause of action within the Act by alleging injury resulting from the negligent "keeping of files, records or other documentation and means of notification, a use or condition of tangible personal property."). *Cf. Robinson,* 727 S.W.2d at 43 (Protective order held not to be tangible property within meaning of the Act.); *Montoya v. John Peter Smith Hosp.,* 760 S.W.2d 361, 364 (Tex.App.1988, writ denied) (In dicta, the court stated that a blank triage slip did not constitute tangible property under the Act.)

Definitions provided in judicial opinions are of little assistance: Several courts have defined "tangible property" as "property that is capable of being handled, touched, or seen." *See Robinson,* 727 S.W.2d at 43; *Lay v. Aetna Ins. Co.,* 599 S.W.2d 684, 686 (Tex.Civ.App.1980, writ ref'd n.r.e.).

5. Unlike the electrocardiograph in *Salcedo*, the "blank" tests do not reflect the condition of the patient. Rather, they resemble more closely the blank triage slips in *Montoya*. 760 S.W.2d at 364.

tangible property within the Tort Claims Act; the Department did not request a jury question distinguishing between the two forms of tests.

The Department raises another argument in point of error 1 (subpoint B). Even if the aforementioned items constitute tangible personal property, the Department contends, "there was no evidence to show a use of these items of property in a manner which proximately caused" Ms. Petty's injury. The Department contends that any injuries Ms. Petty suffered resulted from errors in judgment by those who treated her; in the Department's view, the articles of tangible property were merely incidental to the transactions and not a proximate cause of any injury to Ms. Petty. *See Lowe v. Texas Tech University*, 540 S.W.2d 297, 301 (Tex.1976) (Greenhill, J., concurring).

We believe the issue is controlled by *Salcedo*. The *Salcedo* court stated:

> [T]he proximate cause of the damages for death or personal injury must be the negligence or wrongful act or omission of the officer or employee acting within the scope of his employment or office. The negligent conduct, however, must *involve* "some condition or some use" of tangible property under circumstances where there would be private liability.

*Salcedo*, 659 S.W.2d at 33 (emphasis added).

■ The Supreme Court did not indicate that the word "involve" should have any meaning other than its meaning in ordinary usage: "to roll up in itself so as to gather in, embrace, or comprehend; to *include*." Webster's New International Dictionary, at 1307 (2d Ed.1950) (emphasis added). Thus, under *Salcedo*, the tangible personal property itself need not be *a proximate cause* of the injury; the use of such property need only be *involved* or *included* in any act or omission by the employee which the jury finds to be negligent and a proximate cause of the injury. That the Legislature has reenacted the Act without

altering the language in § 101.021 waiving governmental immunity in the case of "a condition or use" of tangible property indicates a legislative adoption of the construction in *Salcedo. Robinson v. Central Texas MHMR Center,* 780 S.W.2d 169, 171 (Tex.1989).

■ Jury Question 2 inquired whether the negligence, if any, of agency personnel, considering use or misuse of the enumerated items, was a proximate cause of Ms. Petty's injury. We hold the question constituted a proper inquiry under § 101.021(2) of the Act and *Salcedo*, 659 S.W.2d at 33; and, consequently, Ms. Petty was not required to establish that a use or misuse of tangible property *itself* proximately caused her injuries. Accordingly, we overrule the Department's point of error 1(B).

## *False Imprisonment*

In its first point of error (subpoint C), the Department contends the trial court erred in submitting Question 2 to the jury (and in failing to disregard the jury's answer to that question and to a related question on damages) because Ms. Petty's cause of action was actually one for false imprisonment; thus her suit was barred by governmental immunity, because § 101.057 of the Act expressly excludes claims arising out of false imprisonment from the scope of the statutory waiver of immunity.

■ The elements of false imprisonment are (1) willful detention, (2) without consent, and (3) without authority of law. *Sears, Roebuck & Co. v. Castillo*, 693 S.W.2d 374, 375 (Tex.1985); *James v. Brown*, 637 S.W.2d 914, 918 (Tex.1982).[6]

■ Ms. Petty indeed pleaded that her confinement was willful, involuntary, and unlawful (because Department employees failed to meet statutory and constitutional requirements for involuntary confinement). Ms. Petty also pleaded that, "because of [the] years of confinement, [she] retreated to stereotyped behavior typically found in a person institutionalized in a prison-like en-

---

**6.** We note that, unlike the Restatement Second of Torts, Texas law places the burden of proving the unlawfulness of the confinement on the plaintiff, rather than allowing the defendant to raise legality as an affirmative defense. *See* Restatement Second of Torts § 35, at 52 (1965).

vironment." Moreover, Jury Question 1 inquired whether Ms. Petty "sustain[ed] any injury as a result of her confinement."

In addition to the elements of false imprisonment, however, Ms. Petty alleged Department employees were negligent in their treatment of her and in their failure to treat her. Ms. Petty pleaded that "[d]efendants ... subjected [her] to a continued pattern and course of treatment of unreasonable restraint and lack of minimally adequate training or habilitation," preventing Ms. Petty from acquiring those skills which she would have developed had she not been institutionalized. She pleaded further that "[the] [d]efendants' negligence included their failure to develop and supervise the development of ... an appropriate written individualized treatment plan and [their improper supervision of the development and use of] that plan to provide [Ms.] Petty with adequate treatment and habilitation."

Section 101.057(2) excludes from the Act any claim "arising out of assault, battery, false imprisonment, or *any other intentional tort* ...." (Emphasis added). The emphasized phrase implies that the exclusion applies only to intentional torts of false imprisonment. The trial court did *not* submit that theory to the jury and the judgment does *not* rest thereon. Rather, the judgment rests upon the jury's answer to Question 2, which inquired whether any *negligence* by Department personnel was a proximate cause of injury to Ms. Petty. Thus, it is immaterial that the negligence found by the jury, and any attendant injury, occurred *in the context* of her confinement. Nothing in the Act indicates that the Legislature intended to exclude from the waiver persons who are *negligently* injured while in a state of confinement, whether lawful or unlawful. We therefore overrule subpart C of the Department's first point of error.

**BROAD–FORM QUESTIONS**

In its second point of error, the Department contends the trial court erred in submitting Question 2 to the jury and in failing to disregard the jury's answer to Question 2. The Department argues that the "question allows a finding of negligence based on the use of the enumerated property by any one of several hundred employees during a fifteen-year period without clearly establishing proximate cause." We hold the Department failed to preserve the point for appellate review. Tex.R.App.P.Ann. 52(a) (Pamph.1991).

To preserve the point, the Department was required to object to the charge specifically on the grounds raised on appeal. *See* Tex.R.Civ.P.Ann. 274 (Supp.1991). The only related objection we find in the record is this:

Defendants also complain that there is no notice of which agency personnel Plaintiff seeks to hold liable over the 15 years in which the Texas Tort Claims Act is in effect. Such failure makes it impossible for a court of appeals to determine whether there is sufficient evidence to support a finding of negligence under this question. This question basically invites the jury to search and to guess at and to just hang liability on some unknown person and—using—doing some unknown thing at some unknown time.

We find in the foregoing no complaint that Question 2 was erroneous because it allowed the jury to find liability as to any number of unnamed people without establishing proximate cause. Rather, the objection appears to encompass two complaints: (1) that the pleadings were deficient because they failed to give the Department notice of the nature of the claims against it; and (2) that the question invited the jury arbitrarily to assign negligence to the Department without regard to the evidence. With respect to the former contention, we believe the pleadings were sufficient.[7] The second contention is irrelevant

7. The Department avers that the broad form of the pleadings and the jury questions, together with the nature of the proof adduced, required the Department to defend against multiple incidents from which the jury could have inferred

negligence. We disagree. The test under Tex. R.Civ.P.Ann. 45(b) (Supp.1991) for adequacy of the pleadings is whether the pleading gives the defendant fair notice of the claim against it. *See also* 2 McDonald, Texas Civil Practice,

because there is no evidence or allegation that anyone except Department personnel, acting in the scope and course of their employment, was involved in the transactions upon which Ms. Petty recovered judgment.

Because the Department failed to preserve the assigned error for our review, we overrule its second point of error.

## ACTUAL NOTICE

■ Section 101.101(a) of the Act requires that a plaintiff provide the State with written notice of any claim against it not later than six months after the day that the incident giving rise to the claim occurred. The notice must reasonably describe:

(1) the damage or injury claimed;

(2) the time and place of the incident; and

(3) the incident.

Subsection (c) of § 101.101 provides that the notice requirements of subsection (a) *"do not apply* if the governmental unit has *actual notice* that death has occurred, *that*

*the claimant has received some injury,* or that the claimant's property has been damaged." (Emphasis added). The jury found that the Department had actual notice of Ms. Petty's injury. Thus, Ms. Petty was not obliged to provide the Department with written notice containing the three elements specified in § 101.101(a).

■ In its third point of error, the Department contends the trial court erred in submitting Question 31, which inquired about actual notice, because that question incorrectly instructed the jury about the requirements of actual notice. The charge defined actual notice as follows:

"Actual notice" is having actual information or it is, once a reason exists to make inquiry, information about those things which a reasonably diligent inquiry and exercise of the means of information at hand would have disclosed. A governmental entity may have notice through its officers, agents, representatives or employees.

The Department asserts the definition is erroneous because it did not require the

---

§ 5.05, at 10–16 (rev. ed. 1982), citing *Andrews v. Daniel,* 240 S.W.2d 1018, 1020 (Tex.Civ.App. 1951, writ dism'd). Fair notice has been given if "the pleadings are sufficiently specific that '... an opposing attorney of reasonable competence, with the pleadings before him, can ascertain the nature and the basic issues of the controversy and the testimony probably relevant.'" *Rodriguez v. Yenawine,* 556 S.W.2d 410, 414 (Tex.Civ.App.1977, no writ), citing, 2 McDonald, § 5.05, at 13.

Furthermore, in ruling on the adequacy of pleadings, a judge must bear in mind "the positions of the parties and such pertinent factors as their means of knowledge of the facts and access to the necessary evidence." 2 Mc Donald, § 5.05, at 12. In the present case, Ms. Petty made numerous factual allegations regarding which acts she claimed were negligent. For example, Ms. Petty alleged Department personnel

subjected [her] to continuing wrongful restraint and continuing lack of minimally adequate treatment, training, and habilitation because of which Ms. Petty never developed those skills which she would have developed had she not been institutionalized. Defendants, their employees and those acting in concert with them or at their direction, prevented Opal Petty from realizing her developmental potential and thus proximately caused her serious adverse functional development.

Ms. Petty rather specifically described the nature of her injury in the portion of her petition labeled "Sixth Cause of Action (Negligence)" as the

loss of liberty and good health, serious and aggravated on-going regression in intellectual and daily living skills, and lost opportunities to develop those skills which she would have otherwise developed but for her confinement and which are necessary to live outside of an institution without supervision, all as a direct result of the negligent acts of Defendant TDMHMR's employees. Those acts included the negligent use and misuse of tangible personal or real property, as well as the negligent supervision of the use of such personal or real property. [The petition then enumerates specific items of property allegedly used.]

Given the Department's superior ability to ascertain information about the names of specific Department employees and specific acts of negligence and the fact that Ms. Petty's ability to ascertain the existence of specific instances of negligent conduct and the identities of particular employees depended on the record-keeping of the defendant, we do not believe Ms. Petty's pleadings were lacking in specificity or in any way failed to give the Department fair notice of the claims against it.

jury to find that Department personnel had knowledge of the time, place, and nature of the injury as § 101.101(a) of the Act required. We reject the argument.

The relevant statute is not § 101.101(a) but § 101.101(c). The latter requires only that the governmental entity have actual notice that "the claimant has received some injury," and expressly states that "[t]he notice requirements provided or ratified and approved by [Subsection (a)] *do not apply* if the governmental unit has actual notice" of the injury. (Emphasis added). *See also Bowling v. City of Port Arthur,* 522 S.W.2d 270, 273 (Tex.Civ.App.1975, writ ref'd n.r.e.).

██ An interpretation that subsection (c) required a finding that the government agency had notice of the time, place, and nature of the injury would contradict the text of the statute. To interpret the statute as the Department does would be to add to the statute, through implication, elements not required by the unambiguous text of subsection (c). We are forbidden to resort to interpretation by implication when the legislative intent can be gathered from a reasonable interpretation of the language of the statute. *Commonwealth of Massachusetts v. United N. & S.D. Co.,* 140 Tex. 417, 168 S.W.2d 226, 229 (1942).

We hold that actual notice under § 101.-101(c) need not include actual notice of the "time, place, and manner" of the injury. The trial court was obliged to submit only "such instructions and definitions as shall ... enable the jury to render a verdict." Tex.R.Civ.P.Ann. 277 (Supp.1991); *Johnson v. Zurich General Accident & Liability Ins. Co.,* 146 Tex. 232, 205 S.W.2d 353, 353–54 (1947). Under this rule and our holding, the definition of actual notice was not deficient because it failed to include the elements of time, place, and manner of the injury which are part of the written notice requirement of § 101.101(a) of the Act.

Our holding is consistent with the purpose behind the actual notice requirement—"to enable the [governmental entity] to investigate while facts are fresh and conditions remain substantially the same." *City of Houston v. Torres,* 621 S.W.2d 588, 591 (Tex.1981). If government-agency personnel have actual notice of an injury, they are necessarily in a position to inquire as to the details of the time, place, and manner of the injury. In the present case, the Department was in possession of Ms. Petty's medical records and other case-history documentation. It was therefore in a better position than Ms. Petty to glean information about the particulars of her injuries.

We overrule the Department's third point of error.

In its fourth point of error, the Department contends the trial court erred in denying its motion for directed verdict and for judgment notwithstanding the verdict because, "even if the submission of question 31 was correct, the jury had *no credible evidence* on which to base its finding of actual notice."

██ We are instructed, in addressing no-evidence points of error, to examine the evidence in the light most favorable to Ms. Petty's claim, ignoring all contrary evidence and inferences. *See* Powers & Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence",* 69 Texas L.Rev. 515, 522 (1991); Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Texas L.Rev. 361, 364 (1960). We may not hold the evidence legally insufficient unless we are persuaded that a "vital fact may not reasonably be inferred from the meager facts proved in the particular case." Calvert, at 365.

██ We disagree with the Department's contention that the record evidence was so scant that the jury could not reasonably have "inferred from the meager facts proved" that Department staff were aware of some injury to Ms. Petty between January 1, 1970, the effective date of the Tort Claims Act, and May 23, 1986, six months after Ms. Petty's furlough from the San Angelo State School.

In support of its position that Department staff had notice of some injury to Ms. Petty during the relevant time, Ms. Petty invites our attention to defendant's exhibit 60, an "interdisciplinary team staffing re-

port" prepared in 1978 by Delbert Mitchell, a social worker assigned to Ms. Petty's case at the San Angelo State School. The report contains the following reference: "Opal has a mental health commitment dated 5–6–34 which is not a legal commitment to San Angelo Center. This was explained to her to the extent that she was able to comprehend it. Her civil rights were also explained to her in the same manner."

The Department rejoins by pointing to testimony showing that notations in hospital records, indicating "illegal commitment," were "commonplace in 1978 and [were] acted upon through the recommitment process for all persons in question." The Department argues that this testimony *nullifies* any reasonable inference that the notation indicated injury. We disagree. The jury were free to reject the nullification inference because it is no more than a possible inference from the evidence. We cannot say that it would have been unreasonable for the jury to conclude that a notation that Ms. Petty's commitment "is not a legal commitment to San Angelo Center" put the Department on notice of some injury to Ms. Petty. In fact, we can hardly imagine clearer notice that Ms. Petty had incurred a legal injury. A legal injury is an injury giving a cause of action by reason of its being an invasion of a plaintiff's legal right, even though the injury may not be "practically harmful at the time" or may be "slight in comparison to what may develop subsequently." *See Zidell v. Bird*, 692 S.W.2d 550, 555 (Tex.App.1985, no writ). In the present case, the jury could reasonably have inferred that the notation by Ms. Petty's caseworker, in the 1978 report, that Ms. Petty's commitment in 1934 was "not a legal commitment to San Angelo Center," indicated that Department personnel, namely Mr. Mitchell, had notice of some legal injury to Ms. Petty, i.e., the illegal confinement, regardless of whether her behavior at that time indicated any symptoms of "institutionalization syndrome."

In light of the 1978 notation, we cannot say that the evidence was legally insufficient to support the jury's finding that Department employees had actual notice of Ms. Petty's injury between January 1, 1970, and May 23, 1986. We overrule the Department's fourth point of error.

## COMMENT ON THE WEIGHT OF THE EVIDENCE

■ In its fifth point of error, the Department avers the trial court erred in overruling its objection to the word "confinement" in Jury Questions 1 and 14 because use of the word constituted a comment on the weight of the evidence. The trial court submitted Question 1 as follows:

> Did Opal Petty sustain any injury as a result of her confinement?

Question 14, which inquired about damages, was preceded by the following instruction:

> If, in answer to Question 2 . . ., you have found that the conduct of . . . agency personnel . . . proximately caused any injury to Opal Petty during her confinement, then answer Question 14.

The Department contends the use of the word "confinement" in Question 1 and Question 14 assumed as true a controverted fact—that there was an alternative placement for Ms. Petty that was less restrictive than the State Hospital or the State School. By using the word "confinement," the Department asserts, the trial court characterized Ms. Petty's care as "restrictive" and "imprisoning" and thus nudged the jury toward a finding of liability.

Ms. Petty rejoins that the parties did not dispute whether Ms. Petty was "confined" in the neutral sense of describing her physical surroundings following her commitment.

We do not believe the trial court's use of the word "confinement" influenced the jurors' minds on the controlling element of the interrogatory and amounted "to such a denial of [the Department's] rights . . . as was reasonably calculated to cause and probably did cause rendition of an improper judgment." *See* Tex.R.App.P.Ann. 81 (Pamph.1991); *Texas Employers Ins. Ass'n v. McKay*, 146 Tex. 569, 210 S.W.2d 147, 148–49 (1948); *Russell v. Great American*

*Indemnity Co.*, 127 Tex. 458, 94 S.W.2d 409, 410 (1936).

Courts use the word "confine" to indicate a restriction on a person's ability to leave a specified area at will, but the word does not always connote imprisonment. *See American Casualty Co. v. Horton*, 152 S.W.2d 395, 399 (Tex.Civ.App.1941, writ dism'd), and *Southern Surety Co. v. Diercks*, 250 S.W. 755, 755–56 (Tex.Civ. App.1923, writ ref'd). (In actions on insurance policies covering illness which "confines the insured within the house," the trial court did not err by instructing the jury that "[c]onfinement to the house does not necessarily mean a constant literal restraint within the house; and an occasional visit to the office of her physician for treatment, or taking exercise and walking as a part of the plaintiff's treatment would not necessarily mean that she was not at such times confined.").

We do not believe the use of the word "confinement" in Question 1 amounted to an impermissible comment: the question asked whether Ms. Petty was injured as a result of her confinement. The question does not assume any injury, the controlling factor. Nor do we believe use of the word "confinement" in the instructive paragraph of Question 14 amounted to an impermissible comment on the weight of the evidence. The relevant sentence instructed the jury that they should answer the damages question (Question 14) only if they found the conduct of any agency personnel "proximately caused any injury to Opal Petty *during* her confinement." (Emphasis added). The question did not assume that any injury resulted from the confinement or that agency personnel were negligent in their diagnoses or care of Ms. Petty. We therefore overrule the Department's fifth point of error.

## PROSPECTIVE–PAYMENT PROGRAM

■ In its sixth point of error, the Department avers the trial court erred by excluding evidence about the Department's Prospective Payment Program, a program through which the Department pays money to designated community centers on behalf of particular clients. The Department pays $55.60 per day (or $20,294.00 per year) to the Concho Valley Center for Human Advancement as compensation for certain services that the Concho Valley Center provides Ms. Petty.

In its "Answer to Plaintiffs [sic] Sixth Amended Original Petition," the Department requested "as a means of setoff, credit on any judgment rendered in this cause in the amount" the Department has paid and expects to pay in the future to the Concho Valley Center for Ms. Petty's care. In its offer of proof, which the trial court "overruled," the Department elicited testimony from its Deputy Commissioner for Mental Retardation Services. He testified, in effect, that the Department has an agreement with the Concho Valley Center whereby it pays the Concho Valley Center $55.60 per day in return for the Center's providing certain services to Ms. Petty.[8]

On appeal, the Department avers the trial court erroneously concluded that the collateral-source rule prohibited the introduction of evidence of the payment plan. We need not reach that issue because we hold that evidence of the payment plan was not relevant to a material issue in the lawsuit, and was therefore inadmissible.

■ The Department attempted to introduce evidence of the payment plan in support of its plea for a set-off against damages awarded Ms. Petty. A set-off is a defendant's counterdemand against a plaintiff arising out of a transaction extrinsic of the plaintiff's cause of action. *Weisz v. Horton*, 148 S.W.2d 219, 221 (Tex.Civ.App. 1941, writ dism'd judgm. cor.); 80 CJS *Set-off and Counterclaim*, § 3, at 7 (1953). The Department could not raise such a

---

**8.** The Department also offered evidence that Ms. Petty's foster-care provider receives $8.35 per day from the Center and testimony by the Director of Mental Retardation Services at the Concho Valley Center stating the Center expended an estimated $21,424.88 on Ms. Petty's care from December 1985 through August 1988 for case-management services; workshop services; psychological, medical, and dental consultants; and a comprehensive diagnostic and evaluation assessment.

claim unless it had grounds for a suit against Ms. Petty. *See Booth v. Chadwick*, 154 S.W.2d 268, 272 (Tex.Civ.App. 1941, writ ref'd). The state alleged no theory under which it had a *legal right* to recover the relevant sums from Ms. Petty because she was under a *legal duty* to pay them.[9] We therefore overrule the Department's sixth point of error.

## MS. PETTY'S CROSS–POINTS

### DAMAGES LIMIT

 In her first cross-point of error, Ms. Petty contends the trial court erred by limiting her recovery to $250,000 after the jury found damages in the amount of $505,000. The trial court reduced Ms. Petty's award pursuant to § 101.023 of the Act, which limits the state's liability "to money damages in a maximum amount of $250,000 for each person and $500,000 for each single occurrence for bodily injury or death." Ms. Petty argues that, because her injuries were caused by successive occurrences of negligence, each of which further injured her, the State was liable for damages in the amount of $250,000 for each act of negligence involving use or misuse of tangible property, of which the jury found 12.

Ms. Petty relies on *Goose Creek Consol. v. Continental Cas. Co.*, 658 S.W.2d 338 (Tex.App.1983, no writ). That case posed the question of whether two fires which destroyed two schools at two different times constituted a single "loss occurrence" if they were caused by the same arsonist. The insurance policy in *Goose Creek* defined "loss occurrence" as "the total loss by perils insured against arising out of a single event." *Goose Creek*, 658 S.W.2d at 340. The court held that, where there are two fires at two different places with two separate causal factors, there are two "loss occurrences," regardless of whether the same arsonist caused both fires. *Id.* at 341.

*Goose Creek* is distinguishable from the present case. The two fires in that case were separate, there being no causal connection between them. In the present case, on the other hand, Ms. Petty alleged a single, ongoing, indivisible injury—"institutionalization syndrome"—resulting from the totality and orchestration of numerous negligent acts and omissions on the part of Department employees over many years. Unlike the two separate fires in *Goose Creek*, the negligent acts and omissions of Department employees are not separable according to which caused a particular part of Ms. Petty's total injury, and no evidence purported so to distinguish her injuries.

In order to recover the statutory limit for each occurrence of negligence, Ms. Petty was required to present evidence in such a fashion as would allow the jury to link particular incidents of use or misuse of property to distinct injuries and submit jury questions to elicit findings attributing particular injuries to specific acts of negligence. This she did not do and probably could not have done given the apparent nature of her injury. Because of the indivisible nature of Ms. Petty's injury and the absence of any attempt by her counsel to obtain jury findings linking particular negligent acts or omissions with distinct injuries, we hold the trial court properly limited Ms. Petty's recovery to $250,000 in accordance with § 101.023 of the Act.

We overrule Ms. Petty's first cross-point of error.

## CONSTITUTIONAL CHALLENGES

In her second cross-point of error, Ms. Petty asserts the trial court violated the open-courts provision and equal-protection clause of the state constitution by limiting Ms. Petty's damages to $250,000. *See* Tex. Const.Ann. art. I, §§ 3, 13 (1984).

### *Open Courts*

 The open-courts provision of the State Constitution ensures that those bringing common-law causes of action will not be denied unreasonably a right to redress for their injuries. *Hanks v. City of*

---

**9.** Acts which are expressly or impliedly authorized by law cannot be made the basis of a claim for damages. *Farnsworth v. Massey*, 365 S.W.2d 1, 5 (Tex.1963). Presumably, the payments to the Concho Valley Center were lawful; the Department does not contend otherwise.

*Port Arthur,* 121 Tex. 202, 48 S.W.2d 944, 946 (1932). To establish that a statute violates the open-courts provision, a plaintiff must show that (1) she has a "cognizable common law cause of action that is being restricted" and (2) the restriction is unreasonable or arbitrary when balanced against the purpose of the statute. *Lucas v. U.S.,* 757 S.W.2d 687, 690 (Tex.1988); *Sax v. Votteler,* 648 S.W.2d 661, 666 (Tex. 1983).

■ In the present case, Ms. Petty cannot meet the first element of the *Sax* test because she cannot show a "cognizable common law cause of action." Hers is purely a creature of statute which exists solely by virtue of the Act. *See Rose v. Doctors Hosp.,* 801 S.W.2d 841, 845 (Tex. 1990); *Tarrant Cty. Water Control v. Crossland,* 781 S.W.2d 427, 439 (Tex.App. 1989, writ denied); *Tarrant County Hosp. Dist. v. Ray,* 712 S.W.2d 271, 273 (Tex.App. 1986, writ ref'd n.r.e.). We therefore hold that the damages limit of § 101.023 of the Act does not violate the open-courts provision of Art. I § 13 of the state constitution.

### *Equal Protection*

■ Ms. Petty also argues that the damages limit of § 101.023 violates her right to equal protection under Tex.Const. Ann. art. I, § 3 (1984), because it allows full compensation for plaintiffs injured by negligent acts or omissions of state employees where damages amount to $250,000 or less, but permits those suffering damages greater than $250,000 only partial compensation for their injuries. She argues in substance that the Legislature could not fix any such dividing line and was obliged to waive immunity as to all sums or none at all to satisfy the equal-protection requirement. We reject the theory.

When neither a "suspect classification" nor interference with a "fundamental right" is involved, we must sustain a challenged statutory classification if it is "rationally related to a legitimate state interest." *See Spring Branch I.S.D. v. Stamos,* 695 S.W.2d 556, 559 (Tex.1985), *appeal dism'd,* 475 U.S. 1001, 106 S.Ct. 1170, 89 L.Ed.2d 290 (1986). The purpose behind the damages cap in the Act is to "preserve governmental funds." *Tarrant County Hosp. Dist.,* 712 S.W.2d at 273.

We cannot say that the limitation on damages recoverable from the state is "wholly irrelevant to" the legislative goal of "preserving governmental funds." *See McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 1104, 6 L.Ed.2d 393 (1961); *Mass. Indem. & Life v. Tex. State Bd. of Ins.,* 685 S.W.2d 104, 110 (Tex.App.1985, no writ). We therefore decline to hold that there is no rational relation between the discrimination in the Act among plaintiffs based on the amount of their claims and the legitimate legislative goal of preserving state funds.

We overrule Ms. Petty's second cross-point of error.

### PRE–JUDGMENT INTEREST

■ In her third cross-point of error, Ms. Petty contends the trial court erred by refusing to add pre-judgment interest to her damages award.

The Supreme Court of Texas has held that the Act prohibits the award of pre-judgment interest in a suit against the state if the addition of such interest to the damages award would result in a recovery in excess of the maximum allowed by § 101.023 of the Act. *See Weller v. State,* 682 S.W.2d 234 (Tex.1984). Ms. Petty argues that the enactment of Tex.Rev.Civ. Stat.Ann. art. 5069–1.05, § 6(a) (Supp.1991), which provides that "[j]udgments in wrongful death, personal injury, and property damage cases must include prejudgment interest," renders *Weller* obsolete, as the holding in *Weller* depended on the fact that the plaintiff in that case "had no statutory right to prejudgment interest, but rather sought such interest as an element of damages under common law." *Weller,* 682 S.W.2d at 234. With the enactment of art. 5069–1.05 § 6(a), Ms. Petty contends, she acquired a statutory right to pre-judgment interest, and therefore neither *Weller* nor § 101.023 is a bar to her recovery of prejudgment interest. We disagree.

**722**

Because suits against the State are generally barred by governmental immunity, Ms. Petty's cause of action existed *solely* by virtue of § 101.021 of the Act. *See City of Austin v. Cooksey*, 570 S.W.2d 386, 387 (Tex.1978). As a condition of its waiver of immunity under the Act, the legislature limited the State's liability to $250,000 per person per occurrence. Ms. Petty therefore had no "statutory right" to any recovery in excess of this limit.

Ms. Petty rejoins by the following theory. She states in her brief that "damages" consist in "the sum of money the law awards as pecuniary compensation ... for an injury done or a wrong sustained as a consequence of either a breach of a contractual obligation or a tortious act," citing *McRae v. Lindale Independent School District*, 450 S.W.2d 118, 124 (Tex.Civ.App. 1970, writ ref'd n.r.e.). Consequently, merely adding pre-judgment interest to the maximum "damages" allowed by the Act would not be an addition of "damages," but another sum derived from multiplying "damages" by an interest rate in calculating "the compensation allowed by law for the ... detention of money." Tex.Rev.Civ. Stat.Ann. art 5069–1.01(a) (1987).

The theory is misconceived. Strictly speaking, "interest" is a misnomer when used in reference to pre-judgment "interest." The word "interest" is employed only for convenience in speaking of "an *element of damages* necessary to the complete indemnity of the injured party." *Watkins v. Junker*, 90 Tex. 584, 40 S.W. 11 (1897), overruled on other grounds, *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 553–54 (Tex.1985). (Emphasis added).

We hold the trial court did not err in refusing to award pre-judgment interest in addition to Ms. Petty's recovery of the maximum amount allowed by the Act. *See Weller*, 682 S.W.2d at 234; *Dept. of Hwys. & Public Transp. v. Bacon*, 754 S.W.2d 279, 282 (Tex.App.1988, writ denied).

In consequence, we overrule Ms. Petty's third cross-point of error.

We therefore affirm the trial-court judgment. Because we affirm the trial-court judgment, we need not address Ms. Petty's "contingent" cross-points of error.