848 S.W.2d 680 (1992)
TEXAS DEPARTMENT OF MENTAL HEALTH AND MENTAL RETADATION, Petitioners,
v.
Opal PETTY, By and Through her Next Friends, and Linda KAUFFMAN and Herbert Clinton Denson, as Next Friends of Opal Petty, Respondents.
No. D-1939.
Supreme Court of Texas.
December 31, 1992.
Rehearing Overruled April 14, 1993.
*681 Toni Hunter, Dan Morales, Austin, for petitioners.
James C. Harrington, Deborah C. Hiser, Austin, for respondents.

OPINION
GAMMAGE, Justice.
We consider whether our state government may be held responsible for a citizen's injuries resulting from misdiagnosis and mistreatment during her institutionalization in state facilities. The trial court rejected the State's claim that suit was barred by the doctrine of sovereign immunity and rendered judgment for damages. The court of appeals affirmed. 817 S.W.2d 707. We conclude that the State is not immune from such an action and affirm the judgment of the court of appeals.

FACTS
Opal Petty, now 74 years old, spent most of her life in state mental health facilities. In 1934, at the age of sixteen, she was committed to the Austin State Hospital on her father's petition. Thirty-seven years later, in 1971, she was transferred to the San Angelo State School, an institution for the mentally retarded. It was not until ioo mai sue was turiougneu to a losier home and, after four months, to the home of her niece and nephew, Linda Kauffman and Herbert Denson.
Over time the State's diagnosis for Ms. Petty ranged from hebephrenic schizophrenic, mentally ill, not mentally ill, mildly mentally retarded, moderately mentally retarded, to not mentally retarded at all. Her treatment, however, was never affected. For five decades, her treatment consisted of only "custodial" care, the principal rehabilitative therapy being 35 years of work in the hospital laundry at a salary of $2.00 per week.
Ms. Petty brought suit against the Texas Department of Mental Health and Mental Retardation (the Department) and several named individuals alleging negligence, infringement of her rights guaranteed by the Texas Constitution, and violation of state statutes relating to treatment of mentally retarded persons. She complained not only that she was wrongfully confined because she was neither mentally ill nor mentally deficient, but also that she suffered injury because continued misdiagnosis and improper treatment deprived her of an opportunity to function in society.[1] Answering questions favorably to Ms. Petty only as to her negligence cause of action, the jury awarded damages to her of $505,000. The trial court reduced the award to $250,000 under the Texas Tort Claims Act, Tex.Civ. Prac. 101.023(a), and denied Ms. Petty's request for prejudgment interest. The court of appeals affirmed the judgment.

SOVEREIGN IMMUNITY
The central issue in this appeal is whether the Department's actions are encompassed within the limited waiver of sovereign *682 immunity contamea in tne lexas tort Claims Act. See Tex.Civ.Prac. & Rem.Code Ann. §§ 101.001-109 (Vernon 1986 & Supp. 1992). Section 101.021 of the Act provides:
A governmental unit in this state is liable for:
(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within the scope of his employment if:
(A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and
(B) the employee would be personally liable to the claimant according to Texas law; and
(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.
Ms. Petty contended throughout the trial that she was harmed by the Department's use and misuse of her institutional treatment records, which were tangible property within section 101.021(2).
Conceding negligence, the Department asserts that Ms. Petty was not injured by any use of property, but instead by the judgment exercised by its personnel in diagnosis and treatment. It complains that the court of appeals misread Salcedo v. El Paso Hosp. Dist, 659 S.W.2d 30 (Tex. 1983), by holding that the negligent conduct of its personnel need only involve the use of property, rather than requiring that the property be the instrumentality of harm. The Department goes so far as to suggest that the only way Ms. Petty could have been injured by the treatment records was if a large stack of them had fallen on her head.
The Department's argument, however, misses the mark and directly contradicts this court's unanimous opinion in Salcedo, on which we recently relied in Robinson v. Central Tex. MHMR Ctr., 780 S.W.2d 169, 170 (Tex. 1989). In Salcedo, we permitted an action to De maintained ior a government doctor's alleged misreading and misinterpretation of graphs produced by electrocardiograph equipment. Reversing the lower courts' dismissal of the action, we stated:
[T]he proximate cause of the damages for death or personal injury must be the negligence or wrongful act of the officer or employee acting within the scope of his employment or office. The negligent conduct, however, must involve "some condition or some use" of tangible property under circumstances where there would be private liability.

Salcedo, 659 S.W.2d at 33 (emphasis added). This court was well aware that the exercise of judgment based on medical records was required: "Reading and interpreting are purposes for which an electrocardiogram graph is used or employed in diagnosing myocardial infarction." Id. We certainly did not impose upon Ms. Salcedo the burden of proving that her husband died as a result of physical injury from the graph itself, rather than from the diagnosis premised on that record. See also Huckabay v. Irving Hosp. Found., 802 S.W.2d 758 (Tex.App.Dallas 1990, writ denied) (rejecting argument that x-ray machine itself must cause injury, as opposed to its misuse by a technician). Nor should we impose any such burden on Opal Petty.
Here, the jury explicitly found that Ms. Petty was injured by negligence in the use or misuse of property. Jury Question 2 inquired whether "[fjrom 1970 through 1985, was the negligence, if any, of any agency personnel a proximate cause of any injury to Opal Petty?" The question was limited by an accompanying instruction:
For the purposes of Question 2 only, in determining negligence, if any, of agency personnel, consider only their use or misuse of medical records, staff meeting results, interdisciplinary team staffing reports, progress notes, individualized treatment/habilitation plans, mental status exams, tests, evaluations and diagnoses.[2]
*683 The jury's affirmative answer to this question determined that the employees' negligent use or misuse of the various records during the designated period of time was indeed the instrument of harm to Ms. Petty and was sufficient to satisfy the required nexus between employee negligence, the property, and her injury.
The Department further argues that, even if causation is established, no waiver of sovereign immunity occurs because the institutional treatment records are not tangible property under section 101.021(2) of the Tort Claims Act. While recognizing that the records are tangible in that they can be seen and touched, the Department nonetheless contends that Ms. Petty was not injured by the records themselves, but by their contents, consisting of intangible information.
Again, under these facts, our decision in Salcedo is controlling. There we held that misreading and misinterpreting an electrocardiogram was actionable under the Tort Claims Act as a misuse of tangible property. Just as the electrocardiogram was useful as a diagnostic tool because of the information it contained, so are Ms. Petty's records. Just as this court recognized that the purpose of the graph in Salcedo was to develop a diagnosis following reading and interpretation, so were Ms. Petty's records made for use by Department personnel as a diagnostic tool and prognostic device to treat her.
The distinctions the Department suggests we draw between the facts before us and those in Salcedo involve no substantive difference. The first would condition liability on whether the records were generated by a machine or documented by humans. In the latter situation, the Department contends, the intervening exercise of human judgment in determining what observations to record is distinguishable from the same observations mechanically made. Many records used in diagnosing illnesses, both physical and mental, could be generated by either means. Ms. Petty's behavior could have been preserved by videotape or other recording devices rather than by human notes.[3] A temperature could be recorded by machine or be handwritten by a nurse. In Salcedo, we stressed not the method of generating information, but the purpose for which it was intended. There, the electrocardiogram was created for the purpose of being used to make a diagnosis. Here, Ms. Petty's records, ranging from observations to standardized tests and tests results, were generated for the very purpose of making a diagnosis and recommending a course of treatment.[4]
The Department's second basis for distinguishing Salcedo would differentiate the "exact" science of cardiology from the less precise disciplines exploring the workings of the human mind. While all sciences affecting the human condition are in many ways imprecise, in all of them the purpose of generating recorded observations and test results is the samefor use in identifying problems and correcting them. Here, the Department's failure to properly rely on diagnostic tests, records and reports constitutes misuse of them under the Tort Claims Act.
In Salcedo the court found persuasive the Legislature's failure to take action following the request of the Chief Justice, in an earlier case, to amend the Tort Claims Act if we had erred in our interpretation. Salcedo, 659 S.W.2d at 32 (discussing Lowe v. Texas Tech Univ., 540 S.W.2d 297, 303 (Tex. 1976) (Greenhill, C.J., concurring)). That call was recently renewed in Robinson v. Central Tex. MHMR Ctr., 780 S.W.2d 169, 170 (Tex.1989). It has now *684 been sixteen years and nine regular legislative sessions since our decision in Lowe and nine years since Salcedo, and despite amendment and recodification of the Act,[5] and yet another legislative session after Robinson, the Legislature has not even attempted to alter our prior holdings. We recognize the doctrine of stare decisis has its greatest force when applied to cases of statutory construction, and we have acknowledged statutory reenactment without material change as an indication of legislative intent to adopt existing interpretations of this court. See, e.g., Wich v. Fleming, 652 S.W.2d 353, 355 (Tex.1983); Coastal Indus. Water Auth. v. Trinity Portland Cement Div., 563 S.W.2d 916, 918 (Tex. 1978). Today, we follow our unanimous decision in Salcedo and hold that Ms. Petty's treatment records, as used and relied on here, are tangible property, the misuse of which will subject the government to liability just as if it were a "private person... in accordance with the law of this state." See Rawlings v. Angelo State Univ., 648 S.W.2d 430, 433 (Tex.App. Austin 1983, writ ref'd n.r.e.) (quoting Tort Claims Act).

FALSE IMPRISONMENT vs. NEGLIGENT CARE
The Department also contends that because Ms. Petty's cause of action amounts to no more than a claim of false imprisonment, she is barred from recovery under the Tort Claims Act. See Tex.Civ. Prac. 101.057(2) (Vernon 1986 & Supp.1992) (excluding intentional tortsincluding false imprisonment from statutory waiver of sovereign immunity). The elements of false imprisonment are (1) willful detention, (2) without consent, and (3) without authority of law. Sears, Roebuck & Co. v. Castillo, 693 S.W.2d 374, 375 (Tex.1985). Although Ms. Petty did allege her confinement was willful, involuntary, and unlawful, she did not plead false imprisonment. Rather, she pleaded that she was injured because of her confinement and the negligent care she received while institutionalized. The trial court did not submit a question on false imprisonment to the jury, nor did the jury's verdict or the trial court's judgment rest on any such theory. That Ms. Petty's injury occurred during the time she was institutionalized does not make her claim one of false imprisonment barring suit under the Tort Claims Act. See Young v. City of Dimmitt, 787 S.W.2d 50, 51 (Tex. 1990) (per curiam) (recognizing recovery available under Act for negligent conduct even though accompanied by intentional tort); cf. Cuddy v. Texas Dep't of Corrections, 578 S.W.2d 522, 524 (Tex.Civ.App. Houston [14th Dist.] 1979, writ ref'd n.r.e.) (court held Act did not shield government from liability for injuries arising from failure to provide adequate services incidental to rehabilitation of inmates); Jenkins v. State, 570 S.W.2d 175, 178 (Tex.Civ.App. Houston [14th Dist.] 1978, no writ) (court permitted suit for negligent provision of medical treatment to prison inmate).
This case is not about false imprisonment. This case concerns the proper level of care a state hospital must employ when diagnosing and caring for its patients during commitment. Other courts have also recognized this distinction.[6] *685 The jury found that the Department was negligent in its diagnosis and treatment of Ms. Petty. Their findings focused on, and the trial court's judgment was based upon, the poverty of her environment, relating specifically to the use and misuse of various diagnostic tools and treatment plans instrumental in causing her harm. That Ms. Petty suffered this harm in the context of her confinement does not operate to make her claim simply and exclusively one of false imprisonment. She was not sentenced to be incarcerated for a term of yearsshe was committed for treatment. The purpose of involuntary commitment is to provide appropriate therapy, where possible, to restore a productive and normal citizen to the larger community of society, not to remove them from the larger community as punishment. See Rouse v. Cameron, 373 F.2d 451, 452 (D.C.Cir.1967). Involuntary commitment is permissible only because of its "humane therapeutic goals." Id. When the State negligently fails to pursue the goals, as here, liability may attach.

CONCLUSION
Under these facts, we hold that the Tort Claims Act does not preclude recovery for injuries resulting from the negligent use of tangible property and affirm the judgment of the court of appeals.
COOK, J., concurs in the judgment only.
Dissenting opinion by CORNYN, J, joined by PHILLIPS, C.J., and GONZALEZ and HECHT, JJ.
CORNYN, Justice, dissenting.
Today, a majority of this court agrees only on the judgment to be rendered in this case. The four justices joining the plurality opinion have articulated their reasons; the concurring justice agrees only that Opal Petty should prevail, but does not favor this courtor the lower courts and the bar, who rightly look to this court for an explication of Texas lawwith a statement of the principles by which the legal issues raised here should be decided.[1] The result is that no opinion speaks for the court. The important issue upon which the court granted the State's application for writ of error and upon which other cases[2] long pending in this court turn, remains unresolved; the judgment of the court of appeals is affirmed by default. Opal Petty has won her case, but the people of Texas have been disserved. Because I agree with neither the reasoning of the plurality opinion nor the inconclusive result reached by a majority of the court on an issue important to Texas jurisprudence, I dissent.
Under the common law doctrine of sovereign immunity, the state cannot be held liable for the torts of its employees in the absence of a constitutional or statutory exception. Lowe v. Texas Tech Univ., 540 *686 S.W.2d 297, 298 (Tex.1976); Texas Highway Dept. v. Weber, 147 Tex. 628, 219 S.W.2d 70 (1949). We adopted this doctrine early in our state's history, holding that a state agency could not be sued in the courts of Texas without the consent of the state. See Hosner v. De Young, 1 Tex. 764, 769 (1847); see also Larry Schoenbrun, Sovereign Immunity, 44 Tex.L.Rev. 151, 151 (1965).
In 1967 the Texas House of Representatives passed a tort claims bill that waived sovereign immunity completely. Under that bill, the state could be sued as any other litigant in our courts.[3] H.J. of Tex., 60th Leg., R.S. 1271 (1967) (H.B. 728, §§ 3, 4). However, the bill died in the Senate Committee on Jurisprudence on a tie vote. Joe R. Greenhill & Thomas v. Murto III, Governmental Immunity, 49 Tex.L.Rev. 462, 467 (1971). Subsequently, interim study committees of both houses were commissioned to reconsider the subject. See Senate Interim Committee to Study Governmental Immunity, Report to the 61st Legislature (1969) (in response to S.R. 733, 61st Leg., R.S. (1967)); House Interim Committee to Study Doctrine of Sovereign Immunity, Report of the House Interim Committee to Study Doctrine of Sovereign Immunity 1969 (in response to Tex.H.S.R. 396, 60th Leg., R.S. (1967)).
Initially, the 61st Texas Legislature rejected the work of the interim committees and passed a tort claims act that either abolished or restricted sovereign immunity in most circumstances. Robinson v. Central Tex. MHMR Center, 780 S.W.2d 169, 175 (Tex.1989) (Hecht, J. dissenting); Greenhill & Murto, supra, at 467. One commentator summarized the principle argument in favor of abolishing sovereign immunity in the following words:
Individuals should not be required to absorb the total loss when it should be and can properly be spread over the community as a whole.... The ability to distribute the loss throughout the governmental unit involved is [much] greater than the power ot business entities to do the same with respect to insured losses or losses caused to private citizens.
Joe R. Greenhill, Should Governmental Immunity for Torts be Re-examined, and, If So, by Whom? 31 Tex.Bar.J. 1036, 1068 (1968) (quoting comments of W. James Kronzer, Jr.). The House Committee concurred: "It is difficult to argue that a `unit of government,' what with its taxing power, is not better able to distribute the loss than private entities or persons." House Report at 10. However, Governor Preston Smith vetoed the bill, noting that while "the time has arrived when the doctrine of absolute governmental immunity must be reconsidered ... [the vetoed bill], however, is so broad and all-encompassing in scope as to impose upon the taxpayers of the State of Texas an onerous burden." Veto Message of Gov. Smith, Tex.H.B. 117, H.J. of Tex., 61st Leg., R.S. 1621 (1969).
The legislature promptly rewrote the bill to make it acceptable to the Governor. The bill was passed, and became law on May 22, 1969. Tort Claims Act, 61st Leg, R.S, ch. 292, 1969 Tex.Gen.Laws 874 (codified at Tex.Rev.Civ.Stat.Ann. art 6252-19); Greenhill & Murto, supra page 3, at 467-68.
The Tort Claims Act, thus forged by political compromise in the halls of the capitol, waived the doctrine of sovereign immunity only under limited circumstances. Tort Claims Act, 61st Leg, R.S, ch. 292, § 4, 1969 Tex.Gen.Laws 874, 875; Robinson, 780 S.W.2d at 175 (Hecht, J. dissenting). The Tort Claims Act specifically waived sovereign immunity for:
personal injuries or death when proximately caused by the negligence or wrongful act or omission of any officer or employee acting within the scope of his employment or office arising from the operation or use of a motor-driven vehicle and motor driven equipment ... or death or personal injuries so caused from some condition or use of tangible property, real or personal....
*687 Id. § 3.[4]
Since 1969, the Tort Claims Act has been amended three times: once to waive sovereign immunity for property damage proximately caused by a state officer or employee arising from the operation or use of a motor-driven vehicle or motor-driven equipment; [5] once to raise the liability limits;[6] and once to codify the Tort Claims Act into the Civil Practices and Remedies Code.[7] The limited waiver of sovereign immunity for "personal injury and death so caused by a condition or use of tangible personal or real property" has remained a constant. Tex.Civ.Prac. 101.021(2).
Although this court has the power to abolish the common law doctrine of sovereign immunity, we have, prudently I think, invariably held that the decision to waive that immunity and impose the attendant financial responsibility on the taxpayers of Texas is a matter properly committed to the legislature. Hopkins v. Spring Indep. Sch. Dist, 736 S.W.2d 617, 619 (Tex.1987); Barr v. Bernhard, 562 S.W.2d 844, 846 (Tex. 1978); Lowe, 540 S.W.2d at 298; see also Dillard v. Austin Indep. Sch. Dist, 806 S.W.2d 589, 593 (Tex.App.Austin 1991, writ denied) {per curiam, before Powers, Gammage, and Jones, JJ.). We have also written that "[f]or the Legislature to waive the State's sovereign immunity, it must do so by clear and unambiguous language." Duhart v. State, 610 S.W.2d 740, 742 (Tex.1980). Unfortunately, the Tort Claims Act does not establish clear lines between immunized and nonimmunized conduct. As we have repeatedly and with some exasperation noted, it is also ambiguous. Robinson, 780 S.W.2d at 171; Salcedo v. El Paso Hosp. Dist, 659 S.W.2d 30, 32 (Tex.1983); Lowe, 540 S.W.2d at 303 (Greenhill, C.J., concurring). But the legislature's general intention to maintain the state's immunity for most activities, including those at issue here, is reasonably clear, and this court is not at liberty to ignore the Tort Claims Act simply because it is ambiguous.
Since the passage of the Tort Claims Act, we have considered the scope of the statutory waiver of governmental immunity for the use of tangible personal property on four previous occasions. See McGuire v. Overton Memorial Hosp., 514 S.W.2d 79 (Tex.Civ.App.Tyler 1974), writ ref'd n.r.e. per curiam, 518 S.W.2d 528 (Tex. 1975); Lowe v. Texas Tech Univ., 540 S.W.2d 297 (Tex.1976); Salcedo v. El Paso Hosp. Dist, 659 S.W.2d 30 (Tex.1983); and Robinson v. Central Tex. MHMR Center, 780 S.W.2d 169 (Tex.1989).
The plurality, as did the court of appeals below, relies almost exclusively on Salcedo v. El Paso Hospital District to support its interpretation of the Tort Claims Act that tangible property need not itself be a proximate cause of injury, but only be involved or included in any negligent act or omission found to be a cause of damages. In Salcedo, the court determined that the plaintiff had stated a cause of action under the Tort Claims Act when a government physician allegedly misread an electrocardiogram graph. Relying heavily on legislative silence, which the court interpreted as acquiescence, the court held that "an allegation of defective or inadequate tangible property is not necessary to state a cause of action ... if `some use' of the property, rather than `some condition' of the property *688 is alleged to be a contributing factor to the injury."[8] I agree that there is no principled distinction between Ms. Petty's treatment records and the graph in Salcedo, but as in the case of all medical records, the purpose of an electrocardiogram graph is to convey information to a physician, who then uses professional judgment to make treatment decisions. In both cases, the physical property, the record or writing, does not itself cause the injury, but may be evidence of a failure to meet a standard of professional care. The plurality would sanction an identification of virtually any physical object, no matter how remotely related to the cause of harm, to bring such a claim within the waiver. While apparently motivated by the understandable concern that no one injured by the state's negligence go uncompensated, this would result in the exception swallowing the rule whole.
In Salcedo I believe we incorrectly blurred any distinction between tangible property that is itself the instrument of harm and property such as writings or records, which are part of a setting in which harm occurs and which merely memorialize information and ideas.[9] We also erroneously eliminated the use of tangible property from the analysis of proximate cause, and by so doing left the state open to suit for virtually any activity. What Chief Justice Greenhill predicted in his concurring opinion in Lowe would become the law under the plurality's rationale:
This construction would amount to a general waiver in virtually all tort cases. That is not necessarily bad, but I do not think this is what the Legislature intended. It is difficult to imagine a tort case which does not involve the use or nonuse, of some item of real or personal property; and to me, if there is a waiver in all cases where some item of personal property is either used or not used, there is virtually an unrestricted waiver of immunity.
540 S.W.2d at 301-302.
At least the court of appeals in this case, unlike the plurality, was forthcoming in acknowledging the difficulties raised by application of the Tort Claims Act.[10] The difficulties are highlighted in part by the patently inconsistent results reached by other courts on this issue. For example, one court has held that a protective order is not tangible personal property because it merely recorded the court's decision. Robinson v. City of San Antonio, 727 S.W.2d at 43. Another court, attempting to reconcile Robinson with Salcedo, wrote that a "written record may be tangible when it records a tangible situation, as in Salcedo, or intangible when it records an intangible idea, as in Robinson." Montoya, 760 S.W.2d at 364; see also Birdo v. Williams, 1992 WL 347121 (Tex.App.Houston [1st *689 Dist.] 1992, no writ) (stating that an incorrect notation in a report that "`no injuries were noted'" is not use of tangible property, even though "failure to record an essential entry" into a medical chart is use of tangible property). While other courts have been candid in their struggle to draw the subtle distinction between the use and nonuse of allegedly tangible property, the plurality fails to discuss, distinguish, or even mention the many conflicting cases under the Tort Claims Act which are left unresolved by the manner in which the court decides this case.[11]
There are few matters more deeply troubling to a judge of a court of last resort than how to contend with precedent she believes to have been incorrectly decided. On the one hand, the law must have stability and predictability so that people may order their conduct and affairs with some rationality. On the other hand, the judge must consider the harm of compounding error by reflexively applying a clearly erroneous decision, particularly one which interprets a legislative enactment so farreaching as the Texas Tort Claims Act. The Salcedo decision is less than a decade old, was decided by a unanimous court, and has not been legislatively modified. Yet it has spawned a surfeit of conflicting decisions in the courts of appeals, has left the state of the law in doubt, and has undermined the legislature's policy of limiting the state's liability for at least some negligent conduct. And because today's opinion is only that of a plurality, none of these issues are settled. No court, no advocate, and no litigant can justly claim the plurality opinion as precedent for any other case. While I can respect honest disagreement over difficult legal questions, our failure to decide the issue presented is a disservice to similarly situated litigants, an egregious waste of taxpayers' money, and a squandering of judicial resources.
I would reverse the judgment of the court of appeals.
PHILLIPS, C.J, and GONZALEZ and HECHT, JJ., join in this dissent.
NOTES
[1] Specifically, Ms. Petty alleged that the state defendants "wholly failed in their duty to provide appropriate care and services," subjected her to "continuing lack of minimally adequate treatment, training and habilitation," "denied [her] the ability to learn the basic skills necessary to function independently," and made no attempts to "restore her to a useful life in society." As a consequence, Ms. Petty alleged that the defendants had "prevented [her] from realizing her developmental potential and thus proximately caused her serious adverse functional development" and caused her to suffer "serious and aggravated on-going regression in intellectual and daily living skills, and lost opportunities to develop those skills which she otherwise would have developed but for her confinement and which [were] necessary to live outside of an institution without supervision."
[2] If immunity is determined to be waived, the Department alternatively contends that the jury question was improper because it failed to delineate the particular employee and the particular conduct found by the jury to be negligent. Such a notion contradicts this court's mandate of jury submission upon broad-form questions. Tex.R.Civ.P. 277; Texas Dep't of Human Services v. E.B., 802 S.W.2d 647 (Tex.1990).
[3] See Department's Application for Writ of Error at 23-24 n. 6 ("mental status exams" are 848S.W.2d16 interviews; "Progress notes are nothing more than the recorded observations of the various personnel in a hospital or state school.").
[4] See Department's Application for Writ of Error at 23-24 n. 6 (recognizing tests are used to make treatment decisions), at 29 (documentation used to determine care), and at 30 (tests used to determine availability for services).
[5] In 1983, the Legislature amended the Act to alter the definition of "state government" as well as to increase the limitations of liability. Acts 1983, ch. 530, § 1, 1983 Tex.Sess.Law Serv. 3084, 3084-85 (Vernon). The Act was subsequently repealed and reenacted in reorganized form as part of the Texas Civil Practice and Remedies Code. Acts 1985, ch. 959, §§ 1, 9, 1985 Tex.Sess.Law Serv. 3242, 3303, 3322 (Vernon). The language now contained in Section 101.021(2) of the Act remained unchanged.
[6] See, e.g., O'Neil v. State, 66 Misc.2d 936, 323 N.Y.S.2d 56, 60 (N.Y.Ct.C1.1971) (court held state hospital not relieved of duty to exercise requisite care and skill consistent with accepted medical testing and procedure in treating institutionalized patients); Whitree v. State, 56 Misc.2d 693, 290 N.Y.S.2d 486, 489 (N.Y.Ct.Cl. 1968) (court distinguished between false imprisonment and negligence where claim was based on state's failure to provide adequate psychiatric treatment and medical care during plaintiff's 12-year stay in state hospital); Hale v. Portsmith Receiving Hosp. of the Dep't. of Mental Hygiene, 44 Ohio Misc. 90, 338 N.E.2d 371 (1975) (court overruled state's motion to dismiss claim against state mental hospital for negligent treatment of patient). Cf. Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (Supreme Court held institutionalized patients possess constitutional right to adequate treatment); O'Connor v. Donaldson, 422 U.S. 563, 567, 95 S.Ct. 2486, 2489, 45 L.Ed.2d 396 (1975) (in Title 42 suit where plaintiff was held in state hospital against his will for 15 years, Court noted that matters of initial commitment were "irrelevant" and focused on care and assistance provided during confinement).
[1] A coherent majority rationale is particularly important in the American legal system, which has traditionally placed special emphasis on the reasoning underlying a particular decision to determine its precedential value. A statement of the Court's reasoning helps to shape the conduct and decisions of the bench, bar, and the general public.... Moreover, articulation of the legal principles underlying a particular decision, and adherence to those principles in subsequent cases, serves as a check on judicial bias and arbitrariness. Our system's emphasis on reasoning suggests that the objectives of the precedential system certainty, reliance, equality, and efficiency are ultimately best served not by blind adherence to particular judgments deemed to be "controlling," but by the orderly development of well-reasoned legal principles that build logically upon each other and can survive testing over time and in a variety of situations.

Linda Novak, Note, The Precedential Value of Supreme Court Plurality Decisions, 80 Co lum.L.Rev. 756, 757-8 (1987) (footnotes omitted).
[2] See e.g., University of Tex. Medical Branch v. York, 808 S.W.2d 106 (Tex.App.Houston [1st Dist.] 1991) (application for writ of error filed June 25, 1991); Eaklev. Texas Dept. of Human Servs., 815 S.W.2d 869 (Tex.App.Austin 1991) (application for writ of error filed November 14, 1991).
[3] Previous proposals for a tort claims act were introduced, without success, in 1953, 1957, 1959, 1961. Senate Interim Committee to Study Governmental Immunity, Report to the 61st Legislature 6 (1969).
[4] The Tort Claims Act excluded property damage apparently because of the legislature's concern for the financial burden of insurance premiums that would be required to cover such damages. House Report at 13-14; Greenhill & Murto, supra page 3, at 468-69.
[5] Act of April 11, 1973, 63rd Leg., R.S., ch. 50, 1973 Tex.Gen.Laws 77.
[6] Act of May 28, 1983, 68th Leg., R.S., ch. 530, 1983 Tex.Gen.Laws 3084. This act raised the liability of the state government "to $250,000 per person and $500,000 for any single occurrence for bodily injury or death and to $100,000 for any single occurrence for injury to or destruction of property." Id. at § 1.
[7] Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex.Gen.Laws 3242, 3302. This act inexplicably changed the conjunction between the motor-driven vehicle portion of the statute and the tangible real and personal property portion of the statute from an "or" to an "and." One court has properly construed the "and" to mean "or." Bryant v. Metropolitan Transit Auth., 722 S.W.2d 738, 740 (Tex.App.Houston [14th Dist.] 1986, no writ).
[8] But see, Sanchez v. Schindler, 651 S.W.2d 249, 252 (Tex. 1983) ("[A] legislature legislates by legislating, not by doing nothing, not by keeping silent." (quoting Wycko v. Gnodtke, 361 Mich. 331, 105 N.W.2d 118, 121-22 (I960))).
[9] Notwithstanding Salcedo, the majority of our courts of appeals have held that writings are not tangible personal property under the Tort Claims Act. See e.g. Jefferson County v. Sterk, 830 S.W.2d 260, 262 (Tex.App.Beaumont 1992, writ denied) (capias not tangible property); Eakle, 815 S.W.2d at 873 (papers memorializing discretionary actions do not waive immunity); Montoya v. John Peter Smith Hosp., 760 S.W.2d 361, 364 (Tex.App.Fort Worth 1988, writ denied) (blank triage slip not tangible property); Russell v. Texas Dept. of Human Resources, 746 S.W.2d 510, 513 (Tex.App.Texarkana 1988, writ denied) (use of child abuse report forms not use of tangible property); Robinson v. City of San Antonio, 727 S.W.2d 40, 43 (Tex.App. San Antonio 1987, writ ref'd n.r.e.) (written agreement filed with court not tangible property); Wyse v. Department of Pub. Safety, 733 S.W.2d 224, 228 (Tex.App.Waco 1986, writ ref'd n.r.e.) (no waiver of immunity for use of polygraph machine); Wilkins v. State, 716 S.W.2d 96, 98 (Tex.App.Waco 1986, writ ref'd n.r.e.) (issuance of paper evidencing permission for trailer to follow a particular route not use of tangible property); but cf. York, 808 S.W.2d at 108-110 (failure to keep adequate documentation actionable under Tort Claims Act); City of Houston v. Arney, 680 S.W.2d 867, 874 (Tex. App.Houston [1st Dist.] 1984, no writ) (failure to keep documentation actionable under Tort Claims Act).
[10] "We are aware that the cryptic language of § 101.021 has resulted in conflicting opinions in the courts of appeal regarding what constitutes tangible property...." 817 S.W.2d 707, 713 n. 4 (Tex.App.Austin 1991).
[11] Among those cases which the plurality should address and distinguish are: Mitcham v. University of Tex. Medical Branch, 818 S.W.2d 523, 525 (Tex.App.Houston [14th Dist.] 1991, writ denied) (physician's failure to advise patient of danger of using arteriogram needle not waiver of sovereign immunity); Eakle, 815 S.W.2d at 873; Harris v. Galveston County, 799 S.W.2d 766, 768 (Tex.App.Houston [14th Dist.] 1990, no writ) (no waiver when no allegation property was defective or inadequate); Weeks v. Harris County Hosp. Dist., 785 S.W.2d 169, 171 (Tex.App.Houston [14th Dist.] 1990, writ denied) (failure to restrain suicide victim was not a use or misuse of personal property; sovereign immunity waived if personal property "defectively incomplete for [its] intended use"); Montoya, 760 S.W.2d at 364; Russell, 746 S.W.2d at 513; Wyse, 733 S.W.2d at 228; Robinson, 727 S.W.2d at 43; Wilkins, 716 S.W.2d at 98; Christilles v. Southwest Tex. State Univ., 639 S.W.2d 38, 41 (Tex.App.Austin 1982, writ ref'd n.r.e.) (sovereign immunity waived when property is defective or inappropriate for intended use); Velasquez v. Jamar, 584 S.W.2d 729, 732 (Tex. Civ.App.Tyler 1979, no writ) (to invoke waiver tangible property must either be deficient or inappropriate for the purpose for which it was to be used; negligent conduct alone is not sufficient); Brantley v. City of Dallas, 545 S.W.2d 284, 286 (Tex.Civ.App.Amariilo 1976, writ ref'd n.r.e.) (alleged negligent failure of emergency technicians to take plaintiff to hospital after use of sphygmomanometer and stethoscope not waiver).