**TEXAS YOUTH COMMISSION,**
Appellant,

v.

**Peggy RYAN, Appellee.**

No. B14–92–00905–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

July 21, 1994.

Janet Seymour Morrow, Houston, for appellant.

Scott A. Durfee, Houston, for appellee.

Before MURPHY, SEARS and DRAUGHN, JJ.

## OPINION

DRAUGHN, Justice.

Appellee brought suit against appellant, a state governmental entity, under the Texas Tort Claims Act. Based on the jury verdict, the trial court entered judgment for $100,000 to appellee, for injuries she sustained when she was beaten, stabbed, and raped by Tyson Butler ("Butler"), a student in appellant's custody. The jury found that appellant was negligent in supervising the youth and in its misuse of tangible personal property, namely written diagnostic tests concerning evaluation, placement, and control of Butler, which was a proximate cause of appellee's injuries. In one of seven points of error, appellant asserts that the trial court erred in refusing to find as a matter of law that appellant, as a state agency, is immune from suit, because appellee's injuries were not caused by a use or condition of tangible, real or personal property as required by TEX.CIV.PRAC. & REM. CODE ANN. § 101.021(2) (Vernon 1986). Specifically, appellant contends that the use of diagnostic tests and evaluation forms to determine Butler's placement and discipline does not constitute a use of tangible personal property as required by the Texas Tort Claims Act ("TTCA"). It is unnecessary to discuss appellant's other points of error, as we find that, as a matter of law, appellant's utilization of the information contained in written diagnostic tests for placement purposes did not constitute a use of tangible personal property as required by the TTCA, *as that use affected appellee.* Accordingly, we reverse and render judgment in favor of appellant.

The facts reflect that prior to May 6, 1986, Butler had established himself as an habitual juvenile offender, with the potential for more serious crimes. Beginning on December 10, 1982, when he was thirteen years old, Butler was found guilty of criminal mischief. Over the next three years, Butler committed a total of eight thefts, two of which were felonies. Butler received probation for the first several thefts, but was eventually placed in the custody of the Harris County Youth Village on August 22, 1983. However, he was never incarcerated for any long period of time, and was allowed to attend school and otherwise wander freely.

Butler also had a history of absenteeism in school, as well as a record for getting into altercations with other students. Finally, after the eighth theft, the Harris County Juvenile Authorities recommended that Butler be committed to the appellant because: "Tyson's repeated law violations reflect he is not taking the law seriously." Consequently, on January 8, 1986, the 314th Judicial District Court of Harris County signed a commitment order placing Butler in the custody of appellant, stating, "Mr. Butler needs a highly structured environment with constant supervision and control." Butler then underwent a twelve-day diagnostic evaluation at the appellant's reception center, in order to determine whether Butler should be sent to a highly structured state school environment, or to a less supervised halfway house program.

To make this determination, the caseworkers employed by appellant utilized a diagnostic tool called the "Reception Center Placement Scoring/Decision Form," which rated students from zero to higher numbers, zero representing no problems in the scored area, with the number score increasing in relation to the severity of the problem. Prior to 1984, a score of twelve was the determinative score which concluded the appropriate placement for the graded student. At the time Butler was evaluated, however, the cut-off point was raised to fifteen.

When Butler was originally tested, he received a score of sixteen, which would have placed him above the maximum risk level for a halfway house program, and, therefore, he would have been committed to a state school

or similar environment. In making this determination, the scoring committee did not consider any of Butler's prior offenses aside from the eighth theft conviction, because it was the act which resulted in his commitment. Had the committee considered the seven prior thefts, and other delinquent conduct, Butler would have received at least two additional points as an habitual offender, for a total of eighteen. However, the committee instead decided to *change* Butler's score with regard to prior placements, reflecting his unsuccessful tenure in the Harris County Youth Village, from a "one" to a "zero." This lowered his total score to the cut-off point, enabling him to be eligible for a halfway house program. As a result, the diagnostic tests and evaluation information was sent with Butler to appellant's Schaeffer House in El Paso, Texas, on January 21, 1986.

Upon arriving at Schaeffer House, Butler was enrolled in Bellaire High School, though still under close supervision and custody of appellant. Soon after beginning school, Butler again became a disciplinary problem by missing school and fighting with other students. He was also reprimanded for disruptive behavior at the halfway house on February 4, 1986, and, as a result of a body search, a butter knife, taken from the kitchen, was found on his person.

Butler continued to cause problems at the public school as well as at Schaeffer House. Before being expelled from Bellaire High School, he was involved in thirteen different offenses, including absenteeism, problems at Schaeffer House, and assaulting a student by kicking him in the face. Finally, Schaeffer House personnel decided to relieve themselves of Butler. However, instead of re-evaluating him with the intention of placing Butler in a stricter climate, they merely transferred him to Middleton House in Richmond, Texas. It should be noted that this halfway house had experienced numerous problems with their residents committing crimes in the community, possibly due to the failure of Middleton House personnel to properly supervise the residents.

Because Butler was "Level 1," maximum risk student due to his high score on the diagnostic tests, he was supposed to be supervised when going to and from school. However, as was established at trial, Butler was seldom, if ever, accompanied to school, and often roamed the neighborhood asking residents for work. In fact, within the first month of his arrival at Middleton House, Butler was involved in seven incidents involving truancy, disrupting the halfway house program, threatening another resident, and other offenses similar to those he committed while at Schaeffer House.

As of May 2, 1986, the coordinator of Middleton House, Mr. Lupe Palacios ("Palacios"), became concerned that Butler's conduct was becoming more serious. Thus, he wrote a memorandum to the Middleton House supervisor, stating several of the problems caused by Butler, and relating that he was of the opinion that Butler should be transferred to a state school and that a pre-transfer hearing should be set immediately. Unfortunately, no immediate action was taken, and on May 6, 1986, Butler left the house and proceeded to beat, stab, and rape appellee.

The central issue in this appeal is whether appellant's use of the written diagnostic evaluation tests to determine Butler's placement constitutes a use of tangible personal property which proximately caused appellee's injuries. The general rule is that the state is immune from suit for the negligent or intentional acts of its employees unless a specific statutory exception exists. Appellee filed this action under TEX.CIV.PRAC. & REM.CODE ANN. § 101.021 (Vernon 1986), which states:

A governmental unit in the state is liable for:

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

The facts of the present case indicate that appellant's employees or officers may well have been negligent in their supervision and evaluation of Butler. However, such negligence alone does not trigger a waiver of governmental immunity. The real question is whether appellant's negligence involved the use of tangible personal property so as to

implicate a waiver under the above exception to sovereign immunity, and whether such negligent act by appellant's employees or officers proximately caused the injuries appellee suffered.

Appellant argues that not only was the use of the written diagnostic tools not a use of tangible personal property so as to fall within an exception to the TTCA, but that the intervening criminal acts of Butler destroys any nexus between its negligence and appellee's injuries. However, appellee urges us to seek guidance in the trend of opinions issued by the Texas Supreme Court and other courts of appeals regarding these matters. *See Delaney v. University of Houston,* 835 S.W.2d 56 (Tex.1992); *Texas Department of Mental Health and Mental Retardation v. Petty,* 848 S.W.2d 680 (Tex.1992); *Salcedo v. El Paso Hospital District,* 659 S.W.2d 30 (Tex.1983).

■■■ . First, we address the issue of intervening criminal conduct. While an intervening criminal action between a negligent act and a result generally abrogates third-party liability for negligence, it does not automatically vitiate the negligence cause of action, if the negligent actor should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a crime then. *See Delaney,* 835 S.W.2d at 60, *citing* RESTATEMENT (Second) OF TORTS, Sec. 448 (1965). In other words, liability for negligence may remain a question of fact for the judge or jury when intervening criminal conduct exists. In the context of the TTCA, such an intervening intentional act does not automatically bar the negligence cause asserted against the governmental entity. *Id.* Thus, in the present case, appellee's lawsuit is not automatically barred by the TTCA simply because criminal conduct played a role in her injuries. However, the problem we now face is the relationship between the use of the diagnostic tests themselves and appellee's injuries.

For the proposition that appellant's negligence caused her injuries, appellee relies heavily on *Delaney.* However, we do not find this case to be applicable for several reasons. First, the *Delaney* decision did not involve the use or misuse of diagnostic tests or medical records. Instead, it dealt with the failure of the university to repair locks, and contractual claims regarding the university's obligations to provide safe housing pursuant to their contract with the plaintiff. Furthermore, the Supreme Court reversed the summary judgment rendered by the trial court solely on the grounds that the summary judgment could not have been granted on the basis of the intentional torts exception to the waiver of sovereign immunity under the Texas Tort Claims Act. The act provides that the TTCA does not apply to a claim "arising out of assault, battery, false imprisonment, or any other intentional tort ..." TEX.CIV.PRAC. & REM.CODE ANN. § 101.057(2) (Vernon 1986). The court never addressed whether Delaney's claim was otherwise barred by the TTCA; it ruled only that her case was not subject to an adverse summary judgment on the sole ground that it involved an intentional tort under Section 101.057(2). Thus, appellee's reliance upon *Delaney* is misplaced, because the court never passed on the issue of whether the negligence of the university was *in fact* a proximate cause of her rape because that issue was not before them. The only issue that was decided in *Delaney* was that an intervening criminal act by a third party does not *necessarily* vitiate negligence liability on behalf of the state, because it does not fall within the intentional torts exception of the waiver of sovereign immunity under the TTCA. Furthermore, the court noted Delaney's argument that the failure to fix the lock was a failure to perform a *proprietary* function, easily subject to a negligence cause of action, as opposed to a discretionary, subjective one, which would not fall within an exception to sovereign immunity. *Delaney,* 835 S.W.2d at 58. While the court declined to address that specific contention, it is yet another distinguishing factor, as there is some question as to whether the act of evaluation is in fact a subjective, discretionary function.

■■ Therefore, we next consider those cases cited by appellee to support the argument that appellant's use of the written diagnostic tests and evaluations of Butler constitute a use of tangible personal property so as to allow a negligence cause of action under

the TTCA. In *Salcedo v. El Paso Hospital District*, the Supreme Court held that the improper reading and interpreting of electrocardiogram graphs constituted a use of tangible personal property so as to allow a wrongful death recovery under the TTCA. *See Salcedo*, 659 S.W.2d at 33. However, that case is distinguishable from the present one, because the use of the electrocardiogram machine in *Salcedo directly* affected and impacted the person for whose heart condition was being traced. The primary purpose of using and interpreting the electrocardiogram graph was to properly diagnose Mr. Salcedo, to treat him, and prevent him from having a heart attack. By improperly using the graphs, Mr. Salcedo was incorrectly treated, and he subsequently died of a heart attack, the very thing the proper use of the electrocardiogram was intended to avoid.

In this case, the relationship between the written results of Butler's evaluations and the crime he committed upon appellee is much more tenuous. The purpose of conducting a diagnostic evaluation and reducing it to written form was to determine the appropriate action to take with Butler, *not* appellee. Thus, the direct causal connection between the written records and the plaintiff is not present here as it was in *Salcedo*. Furthermore, the electrocardiogram records in *Salcedo* involved an objective physical condition, as opposed to the written records directed at the mental disposition and character evaluation of Butler as we have here.

However, the Supreme Court has recently provided us with additional guidance as to whether the use of written information in medical records falls within the sovereign immunity exception under Sec. 101.021(2). *UTMB v. York*, 871 S.W.2d 175 (Tex.1994). In *York*, the court makes a distinction between tangible property that is itself the instrument of harm, and that which merely conveys information and ideas in a written form. It held that the state medical entity's alleged failure to record information in a patient's medical records and its failure to rely on recorded information did not involve use of tangible personal property so as to implicate the Tort Claims Act. *Id.* at 178–79. *York* stands for the proposition that misuse

of written information containing recorded ideas does not permit claims against the state via the TTCA because information is not tangible personal property that can be touched and handled like paper. Just because it is reduced to writing, it does not become tangible personal property under TTCA. *Id.* at 179. Because the majority decision in *York* conflicted with the rationale in *Petty* and because there was no coherent majority in the latter case, the precedential value of the *Petty* rationale is determinative only in identical cases. *Id.* at 176–77.

There is also another distinction here in the area of proximate cause. Even in *Salcedo* and *Petty*, the misuse of the claimants medical records were the immediate cause of *their* injuries as were all of the written record cases that implicate the TTCA. Such is not the case here, where the written placement, diagnostic tests utilized by appellant had no direct relation to appellee. They were not completed for her benefit, and were merely part of the backdrop of circumstances which led to her unfortunate victimization. They fall short of the required causal nexus to trigger liability under TTCA for her injuries. Appellee acknowledges this distinction, but analogizes the case to those involving motor vehicles driven by government employees which cause injury to third parties. In our opinion, the analogy does not hold because such actions are specifically covered by a different section of the act. TEX.CIV. PRAC. & REM.CODE ANN. § 101.021(1)(A) (Vernon 1986). And unlike information and ideas, automotive vehicles are clearly tangible personal property subject to negligent operation and misuse by governmental employees.

As we have previously stated, it is technically possible to characterize any imaginable action as a case involving use of tangible personalty. *Lowe v. Harris County Hospital District*, 809 S.W.2d 502, 504 (Tex.App.— Houston [14th Dist.] 1989, no writ). However, the use of property must still meet the statutory requirement for *causation*. *Russell v. Texas Department of Human Resources*, 746 S.W.2d 510, 513 (Tex.App.— Texarkana 1988, writ denied) (emphasis in original). Thus, while appellant was apparently negligent in its evaluation and supervi-

sion of Butler, under *York*, the use of written diagnostic tools in this case simply does not rise to the level required to implicate a waiver of sovereign immunity under the TTCA. The tests were merely recorded ideas and information, and were not the direct devices which proximately caused her injuries. *York, supra.*

The horrific nature of the injury inflicted on appellee cries out for damages. However, waiver of governmental immunity is a matter addressed to the legislature, and we are bound by its statutes in that regard. For the legislature to waive governmental immunity, it must do so by clear and unambiguous language. *York*, 871 S.W.2d at 177; *Duhart v. State*, 610 S.W.2d 740, 742 (Tex.1980). Without legislative or constitutional provisions imposing liability for the negligence of state employees, sovereign immunity protects the state. *Lowe v. Texas Tech University*, 540 S.W.2d 297, 298 (Tex.1976). If we had been charged with the writing of the Texas Tort Claims Act provision involved here, we would have, without doubt, drafted it differently. However, we must work with the legislative enactments we are furnished. We cannot independently decide to stretch statutory terms like, "tangible personal property," beyond their ordinary meaning to achieve what appears to be desirable results. We are thus bound by the statutory terms and the interpretation thereof by the Supreme Court in *York*.

Accordingly, we sustain appellant's point of error and find as a matter of law that the use here of information in diagnostic test evaluation forms for placement and discipline purposes does not constitute use of tangible personal property under section 101.021(2) of the Texas Tort Claims Act; and that the state has not waived governmental immunity for negligence involving the use or misuse of such information. We further hold that even if these forms qualified under the act, their use was not the proximate cause of appellee's injuries. We, therefore, reverse the judgment of the trial court and render judgment that appellee take nothing in her lawsuit.